UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )    4:17-CR-234-RLW |
| | ) |
| MOHAMMED ALMUTTAN, | ) |
| | ) |
|     Defendant. | ) |

**SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE**

Defendant Mohammed Almuttan ("Almuttan"), by and through undersigned counsel, respectfully submits this memorandum to assist this Court in fashioning a sentence that is "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a). Almuttan respectfully requests a sentence of probation.

Almuttan stands before this Court for the only criminal conviction of his life. Specifically, Almuttan pleaded guilty, pursuant to a written plea agreement, to conspiracy to sell and transport contraband cigarettes. Almuttan has fully accepted responsibility for his conduct, is profoundly remorseful, and has worked tirelessly to do everything within his ability to make this right. But as this Court crafts the appropriate sentence in this case, it is Almuttan's lifetime of selfless acts, the genuine respect he has earned from those who truly know him, and the demonstrable good he has done for his community that far outweigh the single misstep that brings him before this Court. Almuttan is the proud owner of numerous businesses in the St. Louis area, provider of countless jobs to members of his community, and is the sole provider for his wife and 5 young children.

As Congress and the Supreme Court acknowledge, this Court is charged with the responsibility of evaluating Almuttan as an individual in crafting an appropriate sentence that is particularly tailored to him. *See Koon v. United States*, 518 U.S. 81, 113 (1996) ("It has been

uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue"); *see also* 18 U.S.C. § 3553(a)(1) ("The court…shall consider…the history and characteristics of the defendant").

When faced with the possibility of incarceration, it is easy to lose sight of the fact that a sentence of probation is, by no means, lenient. Indeed, as recently as 2007, the U.S. Supreme Court rejected the idea that a sentence of probation is nothing but an overly-lenient slap on the wrist. *See Gall v. United States*, 552 U.S. 38, 44 and n.4 (2007) ("Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty...[p]robation is not granted out of a spirit of leniency...probation is not merely 'letting an offender off easily.'").

## I.   Procedural Background

On May 24, 2017, Almuttan was named as a defendant in an 86-count indictment along with 34 other defendants. (*See* Doc. 1). Almuttan, however, was named in just 6 of those counts. (*See id.*). On June 2, 2017, this Court entered an Order setting out Almuttan's conditions of release (Doc. 126) and Almuttan has remained on bond for the entirety of this case—which has spanned more than 5 years. A significant amount of that time period at the outset of this case required Almuttan to wear an ankle bracelet with location monitoring protocols.

On April 7, 2022, Almuttan entered a plea of guilty to Count 1 of the indictment (Doc. 1946) pursuant to a written plea agreement. (Doc. 1947). All remaining counts of the indictment in which Almuttan was named were dismissed by the Government at the time of his plea hearing. (*See* Doc. 1946).

On June 2, 2022, the United States Probation Office prepared a disclosure Presentence

Investigation Report ("PSR"). (Doc. 2023). Neither the Government nor Almuttan filed any objections. The Probation Office filed its final PSR on June 30, 2022. (Doc. 2114). Sentencing is scheduled to occur on October 3, 2022. (Doc. 2220).

## II.     Legal Standard

As this Court is aware, Congress has mandated that the sentence imposed in this case be "sufficient, but not greater than necessary" to achieve the objectives of punishment. 18 U.S.C. § 3553(a). The United States Sentencing Guidelines, while advisory, "are no longer mandatory." *United States v. Ture*, 450 F.3d 352, 356 (8th Cir. 2006); *see also United States v. Booker*, 543 U.S. 220, 224 (2005).

As the United States Court of Appeals for the Eighth Circuit has established, the methodology this Court should follow post-*Booker* is the following:

> In sentencing a defendant, a district court must first determine the advisory sentencing range as recommended by the Guidelines . . .. Next, the district court should decide if any applicable Guidelines provisions permit a traditional "departure" from the recommended sentencing range . . .. The term "departure" is "a term of art under the Guidelines and refers only to non-Guidelines sentences imposed under the framework set out in the Guidelines" . . .. The calculation of the initial advisory Guidelines range, along with any applicable departures, results in a "final advisory Guidelines sentencing range" . . .. Finally, in determining the actual sentence that should be imposed, a district court must consider whether the factors in 18 U.S.C. § 3553(a) justify a "variance" outside the final advisory Guidelines sentencing range . . .. As opposed to a "departure," a "variance" refers to a "non-Guidelines sentence" based on the factors enumerated in Section 3553(a).

*United States v. Lozoya,* 623 F.3d 624, 625-26 (8th Cir. 2010) (citations omitted).

## III.    Advisory Sentencing Guidelines

The PSR correctly computes the total offense level, in the absence of any departures or variances, as 25 (*see* Doc. 2114 at ¶ 74) and Almuttan's criminal history category as I. (*See id.* at ¶ 79). The PSR also appropriately notes that a below-Guidelines sentence may be warranted in this case. (*See id.* at ¶ 139).

### IV.   A Downward Variance is Warranted

As a matter of law, this Court must not presume the Guideline range reasonable, but must make an individual assessment of the 18 U.S.C. § 3553(a) factors based on all the facts presented. *Gall v. United States*, 552 U.S. 38, 50 (2007). Based upon a consideration of the statutory sentencing factors set out in 18 U.S.C. § 3553(a), a downward variance is warranted in this case.

Section 3553(a) sets forth a general directive to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. Section 3553(a) then lists numerous factors that a sentencing court must consider. Especially relevant to this case, and supportive of this motion for a downward variance, are the following factors:

### A.   The History and Characteristics of the Defendant – 18 U.S.C. § 3553(a)(1)

Almuttan is a 40-year old man facing sentencing for the only crime he has ever committed. Almuttan is happily married and is the proud father of 5 young children. His family relies entirely on Almuttan for financial support.

Federal courts have historically recognized extraordinary family circumstances as an appropriate basis for a downward departure pursuant to U.S.S.G. §5H1.6 or a downward variance, which Almuttan seeks in this case. In the context of a departure, Section 5H1.6 provides that "family ties and responsibilities are not *ordinarily* relevant in determining whether a departure may be warranted." (emphasis added). However, the Sentencing Commission and federal courts interpreting this Guideline consistently recognize that "a downward departure may be appropriate where *extraordinary* family circumstances exist." *United States v. Blackwell*, 897 F. Supp. 586, 588 (D.D.C. 1995) (emphasis in original); *see also United States v. Big Crow*, 898 F.2d 1326, 1331–32 (8th Cir. 1990) (affirming district court's below-Guidelines range sentence pursuant to USSG §5H1.6); *United States v. Johnson*, 964 F.2d 124, 129 (2d Cir. 1992) ("Extraordinary family

4

circumstances are widely accepted as a valid reason for departure"); *United States v. Alba,* 933 F.2d 1117, 1122 (2d Cir.1991) (defendant and his wife cared for their four- and eleven-year-old daughters and the defendant's disabled father and paternal grandmother. Noting the special situation of this "close-knit family whose stability depends on [the defendant's] continued presence," the Court let stand the sentencing court's finding that "incarceration in accordance with the Guidelines might well result in the destruction of an otherwise strong family unit" and its conclusion "that these circumstances were sufficiently extraordinary in this case to support a downward departure"); *United States v. Pena*, 930 F.2d 1486, 1494 (10th Cir. 1991) (Court affirmed district court's decision to depart downward from Guideline range of 27 to 33 months to a term of probation on grounds that "Defendant is a single parent of a two-month old child and is the sole support for herself and her infant child. In addition, she has been steadily employed for a long time and is providing for the financial support of her 16–year old daughter who, herself, is a single parent of a two-month old child. Therefore, should the Defendant be incarcerated for an extended period of time, two infants would be placed at a potential risk. Defendant has no prior record of drug abuse, nor other felony criminal convictions and has held long-term employment. She poses no threat to the public and would be justly punished, sufficiently deterred and adequately rehabilitated by a sentence of probation with community confinement as a special condition. Accordingly, a downward departure to a term of probation is appropriate as the Defendant does not now need to be incarcerated to protect the public from other crimes"). These cases governing downward departures are instructive in the context of variances because many were handed down prior to *Booker* when the Guidelines were mandatory, not advisory.

In *United States v. Spero*, 382 F.3d 803, 804 (8th Cir. 2004), the Eighth Circuit affirmed the district court's conclusion that "Spero's family circumstances qualify as exceptional and

therefore warrant granting him a downward departure." The court noted, "Spero is married and has four children, ranging in age from ten to two. One of his children, Ari, suffers from a variety of developmental disorders." *Id.* The Court continued, "The type of care Ari requires is intense and hands-on. Spero's wife stays at home with Ari and cares for him while Spero is at work. Mrs. Spero identified Spero's involvement with Ari as a 'very important part of [Ari's] home life.' Specifically, Spero's nighttime routine with his son is a key component of Ari's care. Mrs. Spero indicates that 'the slightest change in [Ari's] daily routine can cause him to become extremely upset and violent.'" *Id.* at 804-05 (internal citations omitted). The Court concluded, "We are convinced that a long-term departure of Spero from his son's life would cause an extreme setback for Ari and the rest of the family. When one parent is critical to a child's well-being, as in this case, that qualifies as an exceptional circumstance justifying a downward departure." *Id.* at 805. Given that Almuttan's wife must spend her days caring for their 5 children and the fact that Almuttan is the sole breadwinner for the family—and an extremely hardworking person at that—Almuttan respectfully requests that this Court take his extraordinary family circumstances into consideration when fashioning an appropriate sentence in this case.

As he stands before this Court for sentencing, Almuttan owns several successful small businesses in the St. Louis area. But that is remarkable and speaks to his true character given that he has lived a profoundly difficult life and because what he has accomplished was anything but easy.

Born in Ramallah, a Palestinian city in the central West Bank of what is now an Israeli territory, Almuttan was forced to withdraw from school after the sixth grade in order to begin providing for his family when his father passed away when Almuttan was just 10 years old. Due to the financial difficulties thrust upon his family when his father died, Almuttan and his brothers

6

began working to support the family. Getting by with subsistence farming, Almuttan and his large family struggled to put food on the table. By 2001, Almuttan and certain members of his family—including his mother, who suffers from chronic debilitating illnesses—were able to relocate to Canada and, eventually, to St. Louis, Missouri, in search of a better life. Almuttan resides legally in this nation as a permanent resident and he has a naturalization application pending with the United States government seeking his dream: American citizenship.

As soon as he and his family arrived in St. Louis, Almuttan began tirelessly working, yet again, to provide for his family—which was growing.  In 2005, Almuttan married his wife, Kolude, and is now the father of 5 young children. His wife and children are entirely dependent upon him.

Almuttan and his brothers were eventually able to start numerous businesses which serve and enhance the St. Louis community. Indeed, as Reverend Elston K. McCowan—the Vice President of the St. Louis City branch of the NAACP—notes in a letter, "Mr. Almuttan is a small business owner that hires from the local neighborhoods where he operates several convenience stores in St. Louis City and St. Louis County." Reverend McCowan explains, "his stores are the reason some North St. Louis City Neighborhoods are no longer food deserts. Mohammed provide[s] fresh fruits and vegetables at all of his stores. He continues, "Mr. Almuttan is kind and charitable. He donates school supplie[s], food items as well as makes cash donations to needy families. I have personally referred families and individuals to him for help and he has yet to refuse a request." This is a testament to Almuttan's true character: a man with a sixth grade education who has pulled himself up by the bootstraps and who never turns away opportunities to help those in need.

But Almuttan's success in his business endeavors have not come without sacrifice and misfortunes. During an armed robbery in 2007 at one of his family's stores, Almuttan was shot

7

twice and struggles with pain to this day. Tragically, Almuttan lost his brother who was fatally shot during the robbery of their family store. Making matters worse, in addition to the physical pain associated with the shooting—a bullet remains lodged in his left leg—Almuttan was diagnosed with PTSD associated with the ordeal and from having witnessed his brother's murder. Additionally, in 2019, while this case was pending, while standing outside one of his businesses in St. Louis where he was working, Almuttan was struck by a stray bullet when two cars, apparently engaged in a rolling gun battle, happened to drive past his store. He had to undergo multiple arduous surgeries associated with both of these shootings. But not even these tragic and terrifying incidents have interfered with Almuttan's work ethic and commitment to serving his community.

Indeed, Almuttan's continuing commitment to serve the communities in which he and his family operate their businesses cannot be overstated. He is passionate about his work and he is unwilling to turn his back on the community that he and his family call home. Significantly, the role that Almuttan plays in the day-to-day operations of his businesses makes clear that these businesses will fail if he is removed from the equation. When an employee does not show up for work, Almuttan is personally present to man the cash register. When an employee's family is struggling financially, Almuttan quite literally gives them the shirt off his back. And when the businesses are asked to help their communities—even in the midst of a global pandemic when everyone was suffering—Almuttan was there to ensure people had access to food and necessities in areas where there was no easy alternative. Were Almuttan to be subjected to any duration of custodial imprisonment, his businesses will fail and his family will needlessly suffer.

What perhaps stands out most about Almuttan is the extent to which he has selflessly—and for decades—served others, not only financially but with actual boots on the ground. As but

8

one example, a friend notes:

> Mohammed Almuttan has always been an upright character in the community. In our friendship, he has really been there for me, especially when the Covid-19 hit and the company I worked for had to reduce my working hours. He made it a point to be there and show a significant amount of support during a sudden and arduous job search. It was Mohammed Almuttan that was a source of camaraderie for both me and my family. He has truly been a good friend over the years.
>
> In addition to our friendship, he is a usually upstanding member in the community both at his neighborhood and the cities he is operating his various businesses in the St. Louis Area and its environs.

Almuttan's commitment to those around him very much includes his family. His wife, a homemaker, and his 5 young children all rely on him for love, guidance, and financial support. Additionally, Almuttan helps to care and provide for his mother who suffers from chronic illness.

Almuttan's life has had more than its fair share of pain and suffering. Nonetheless, Almuttan has persevered and has refused to let his troubles define him. To the contrary, he has worked tirelessly to build successful small businesses, to find the time and resources to accomplish charitable acts, and he has a demonstrated track record of good citizenship.

Federal courts routinely recognize a defendant's record of charity and benevolence as warranting a reduced sentence. Perhaps most notably, the United States Court of Appeals for the Seventh Circuit recently affirmed the probation sentence H. Ty Warner, the billionaire creator of Beanie Babies, received for evading $5.6 million in federal taxes by hiding assets in a Swiss bank account. *See United States v. Warner*, 792 F.3d 847, 850 (7th Cir. 2015). The sentencing court acknowledged Warner's "private acts of kindness, generosity and benevolence" and emphasized that "many of them took place long before Warner knew he was under investigation." *Id*. at 854. Almuttan's life—long before and during the investigation that brings him before this Court—is one of sincere kindness, generosity, and good will. This is who Almuttan is, plain and simple. And this is a man who will continue giving back to his community as he has for decades—in any and

9

every way he possibly can.

> B. <u>The Nature and Circumstances of the Offense and The Need to Reflect the Seriousness of the Offense, to Afford Adequate Deterrence, and to Protect the Public from Further Crimes of the Defendant – 18 U.S.C. §§ 3553(a)(1) and (a)(2)</u>

Almuttan accepts full responsibility for his crime and accepts that it is serious. But it is important for this Court to correctly place into context where Almuttan fits into the case before this Court.

Almuttan stands convicted of a conspiracy to sell contraband cigarettes: in other words, an agreement to sell cigarettes legally purchased in the State of Missouri in other states in a manner that causes a state tax loss by those other states. He has not been convicted of many of the more serious offenses charged in this indictment which include the sale of controlled substances and money laundering. (*See* Doc. 1). This is noted not to downplay in any manner the seriousness of the offense which brings Almuttan before this Court but, instead, merely to place it into its proper context as this Court considers the appropriate sentence.

As it stands, Almuttan's life has already been uprooted by the investigation and indictment in this case. Indeed, Almuttan has already suffered many consequences as a direct result of this matter and has already lived the past 5 years under this Court's supervision with significant limitations on his freedoms including, for a significant time at the outset of this litigation, location monitoring with an electronic ankle bracelet. Nonetheless, as he has always done, Almuttan has persevered and worked harder than ever to ensure that his businesses have not shuttered and his employees and his family have not had to go without.

Indeed, it may have been understandable had he just thrown in the towel when this case was indicted—but he did the exact opposite. He buckled down and worked even harder, contributed even more to his community, complied with his conditions of release, and maintained

stable employment and a stable home environment for his wife and school-aged children.

A sentence of probation undoubtedly reflects the seriousness of his offense, affords more than adequate deterrence, and protects the public from any further crime of Almuttan. He has learned his lesson. Almuttan is as committed to never finding himself before this, or any other Court ever again, as he is to his own family and his community.

Against this backdrop, and as demonstrated by his complete lack of criminal history and his performance on bond for more than 5 years, Almuttan will never commit another crime. Almuttan has already suffered greatly as a result of his actions, and the shame and humiliation this criminal case has brought him has been difficult for him to bear. He is an honorable man, a man who takes great pride in his integrity, and a man who will not recidivate. Almuttan genuinely perceives the felony conviction itself as a stain on his character—and that underscores that a sentence more punitive than probation is unnecessary.

Furthermore, sentencing courts often consider a defendant's age when considering this Section 3553(a) factor. Indeed, there is an abundance of legal authority where courts have given notably less weight to the Sentencing Guidelines in recognition of the fact that older individuals, even as young as 40, are far less likely to commit additional crimes. *See* United States Sentencing Commission, *Recidivism: Criminal History Computation of the Federal Sentencing Guidelines* (2004) (showing that those in the age group of 41 to 50 who fall in criminal history category I have an especially low recidivism rate of 6.9%, as compared to those, for example, in the 36 to 40 years of age bracket who recidivate at a rate of 12.1% and those under age 21 who recidivate at a rate of 29.5%); *see also United States v. Carmona-Rodriguez*, 2005 WL 840464, *4 (S.D.N.Y. 2005) (observing that those defendants "over the age of forty...exhibit markedly lower rates of recidivism in comparison to younger defendants"). The Sentencing Commission releases such empirical

11

studies precisely so that, in cases such as this, the Court can include these facts in its consideration of a fair sentence.

        C.        <u>The Kinds of Sentences Available – 18 U.S.C. § 3553(a)(3)</u>

In *Gall*, the U.S. Supreme Court observed that probation, "'rather than an act of leniency,' is a 'substantial restriction of freedom.'" 552 U.S. at 44; *see also Warner*, 792 F.3d at 860 (affirming term of probation as "a sufficiently serious sentence"); *United States v. Coughlin*, No. 06-20005, 2008 WL 313099, at *5 (W.D. Ark. Feb. 1, 2008) (recognizing that "probation can be severe punishment[], hugely restrictive of liberty, highly effective in the determent of crime and amply retributive," and that "[n]ot all defendants must be sentenced to imprisonment to be duly punished"); *United States v. Brady*, No. 02-CR-1043 (JG), 2004 WL 86414, at *8 (E.D.N.Y. Jan. 20, 2004) (noting that probation is "a punitive measure"). Congress and the Sentencing Commission have similarly recognized that probation, "a sentence in and of itself," may constitute an appropriate alternative to incarceration that meets fully the statutory purposes of sentencing. *See* U.S.S.G., Ch. 5, pt. B, Intro. Cmt. (citing 18 U.S.C. § 3561). Probationers remain subject to "several standard conditions that substantially restrict their liberty," including restraints on their ability to associate freely or to leave the judicial district. *Gall*, 552 U.S. at 48. The Court can also impose a variety of "discretionary conditions" to probation, 18 U.S.C. § 3563(b), and the violation of any condition can be grounds for revocation and the imposition of a term of incarceration.

Nor was probation intended by Congress to be an exceptional kind of punishment. To the contrary, Congress directed, more than three decades ago, that the Guidelines should reflect the "general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." 28 U.S.C. § 994(j). This is precisely the position in which Almuttan finds himself.

12

He is a first-time offender who has not been convicted of a crime of violence.

Almuttan submits that a sentence of probation is sufficient punishment in this case. Indeed, the felony conviction alone has already hit Almuttan hard and the collateral consequences are real. Almuttan has learned his lesson and has fully accepted responsibility for his conduct.

      D.      <u>Any Pertinent Policy Statement of the Sentencing Commission – 18 U.S.C. § 3553(a)(5)</u>

In setting forth the duties of the Sentencing Commission, Congress mandated that "the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." 28 U.S.C. § 994(j). This statute describes Almuttan perfectly. He is a first time offender who has not been convicted of a crime of violence or an otherwise serious offense, and he is a critical member of his community and his family. A sentence of probation would satisfy the aims of sentencing as defined by the United States Congress.

      E.      <u>The Need to Avoid Unwarranted Sentence Disparities – 18 U.S.C. § 3553(a)(6)</u>

A sentence of probation in this case would satisfy Congress' mandate that sentencing courts should aspire to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

Many defendants charged in this indictment have already received sentences for their conduct. For those who, like Almuttan, have been convicted of Count 1 of the indictment, a sentence of probation or time served is the norm—not the exception. In fact, probation or time served has been deemed the appropriate sentence for 14 defendants charged in, and convicted of, Count 1 of the indictment.[1] Indeed, no defendant convicted of Count 1 has received a sentence of

---

[1] One of these 14 defendants, Najeh Muhana, was sentenced by the United States District Court for the District of New Jersey after that Court accepted transfer of his case. *See United States v. Muhana*, 2:20-CR-388.

13

imprisonment at any point in the last 3 years. And of those few who received custodial sentences, several had criminal histories greatly in excess of Almuttan's which, of course, is nonexistent.

In this case, a sentence of probation is "sufficient, but not greater than necessary," 18 U.S.C. § 3553(a), and will avoid unwarranted sentencing disparities. 18 U.S.C. § 3553(a)(6).

### F.   The Need to Provide Restitution – 18 U.S.C. § 3553(a)(7)

Section 3553(a)(7) directs this Court to consider "the need to provide restitution to any victims of the offense." The PSR correctly explains that the only victims of the offense for which Almuttan was convicted are the States of Illinois and New Jersey which, theoretically, lost cigarette tax revenue caused by the sale of cigarettes in those states which had been purchased in the State of Missouri. (*See* Doc. 2114 at ¶ 61). Furthermore, the PSR accurately notes that the parties to this case agreed in the written plea agreement, "that calculating the actual loss in this case is not possible and the parties therefore make no agreement as to the actual tax loss." (*Id.*). Additionally, the PSR accurately reflects that "the parties agreed and jointly recommend the defendant not be ordered to pay restitution." (*Id.*).

To be clear, however, Almuttan agreed to pay approximately $2 million in criminal forfeiture. This has already been satisfied in advance of sentencing and in anticipation of sentencing—and is a reflection of the extent to which he has taken full responsibility for his conduct.

### V.   Conclusion

Never has there been a defendant before this Court who more desperately wishes that he could go back in time to make better decisions. However, one of the toughest realities to accept is that this is simply not possible. We must accept the consequences of the decisions we have made. But if ever there were a defendant standing before this Court who is as remorseful as he is

14

committed to never finding himself anywhere close to this situation again, it is Almuttan.

Almuttan is a good man who will be forever defined by this conviction regardless of what sentence this Court imposes. However, the true testament of a person's character is what they do when the world is collapsing around them. Time and time again, Almuttan has answered that question through his actions: when he was forced to discontinue his education after sixth grade, he buckled down and worked hard—even as a small child—to provide for his family; when he immigrated to the United States with no more than the clothes he was wearing, he worked tirelessly to build one small business at a time; and when he was the victim—twice—of gun violence solely because he was at work, not because he was involved in any nefarious activity, he suffered through pain, trials, and tribulations to continue to provide for his family and to better his communities in the process. The world is truly a better place because he is in it—and that cannot be said of everyone who finds himself before a federal criminal court for sentencing.

A sentence of probation is not a slap on the wrist—it is, instead, the appropriate sentence in this case taking into account all relevant considerations including Almuttan's role in his family, his place in the community, and his persistent commitment to righting his wrong and never finding himself in this position ever again.

For all the reasons set forth in the PSR, in this memorandum, and in the letters submitted for this Court's consideration, Almuttan appeals to this Court's discretion to impose a non-custodial sentence as a sentence of probation is "sufficient, but not greater than necessary," and that is what the law requires. 18 U.S.C. § 3553(a).

Respectfully submitted,

**Margulis Gelfand, LLC**

*/s/ Justin K. Gelfand*
JUSTIN K. GELFAND, # 62265
IAN T. MURPHY, #68289
7700 Bonhomme Avenue, Suite 750
St. Louis, MO 63105
Telephone: (314) 390-0234
Facsimile: (314) 485-2264
justin@margulisgelfand.com
ian@margulisgelfand.com
***Counsel for Almuttan***

**Certificate of Service**

I hereby certify that the foregoing was filed electronically with the Clerk of the Court, and that all parties will receive notice of this filing through this Court's electronic filing system.

>*/s/ Justin K. Gelfand*
>JUSTIN K. GELFAND, # 62265
>IAN T. MURPHY, #68289
>7700 Bonhomme Avenue, Suite 750
>St. Louis, MO 63105
>Telephone: (314) 390-0234
>Facsimile: (314) 485-2264
>justin@margulisgelfand.com
>ian@margulisgelfand.com
>**Counsel for Almuttan**